

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HAKIM BOND, PRO SE,              )
    PLAINTIFF.                   )
                     )
                     )   CA NO: 08cv4527
    VS.                          )
                     )
V I S I O N Q U E S T, AND THE   )
VISIONQUEST NATIONAL DIRECTOR    )
MAJOR SMITH, UNIT DIRECTTOR,     )
COUNSELOR AND MEDICAL STAFF,     )
AND MR. MCGLAUHLIN ALL OF        )
VISIONQUEST, THE CLARION HOS-    )
PITAL AND THE TREATMENT TEAM,    )
DOCTOR PETER MEYER, AND THE      )
CHILDRENS HOSPITAL OF PHILA-     )
DELPHIA, THE CITY OF PHILADEL-   )
PHIA, THE PHILADELPHIA DE-       )
PARTMENT OF HUMAN SERVICES       )
DIRECTOR AND THE DIRECTOR OF     )
THE YOUTH STUDY CENTER, AND      )
THE PHYSICIAN AND MEDICAL        )
STAFF TO INCLUDE NURSES. AND     )
OTHER THERAPIST OR THE TREAT-    )
MENT TEAM, THE DIRECTOR OF       )
AND COMMUNITY BEHAVIORAL         )
HEALTH AND AMANDA LATSHAW AND    )
SABRINA BACKSTONE OF COMMUNI-    )
TY BEHAVIORAL HEALTH, AND THE    )
BENCHMARK BEHAVIORAL HEALTH      )
SYSTEMS AND THE DIRECTOR, AND    )
DR. JEROME VANCE, AND THERAPIST  )
MR. DAVE ASAY AND SUPERVISING    )
THERAPIST MR. DAVE GUYMAN.       )
DR. THMOAS,                      )
    DEFENDANTS.                  )
                     )



FILED
SEP 25 2008
MICHAEL E KUNZ, Clerk
By_____Dep. Clerk

## COMPLAINT

(1).     THE PLAINTIFF IS A RESIDENT OF PHILADELPHIA, PENNSYL-
VANIA.
(2).     THE RESIDENCES OF DEFENDANT(S) ARE UNKNOWN AND NOT RELE-
VANT FOR THE FILING OF THIS CIVIL ACTION TO THE KNOWLEDGE OF TH
PLAINTIFF IN THIS MATTER.

## JURISDICTION

THIS COURT HAS JURISDICTION OVER THIS MATTER PURSUANT TO
U.S.C.(APPLICABLE) AND OR THAT DEEMED RELEVANT BY AND TO THE BEST
KNOWLEDGE AND LEGAL EXPERTISE OF THIS COURT.

FACTS

1.      ON, OR ABOUT MARCH 18,2004, PLAINTIFF HAKIM BOND WAS TAKEN
FROM A VISIONQUEST FACILITY IN WESTERN, PENNSYLVANIA,IN FRANKLIN,
TO THE CLARION PYSCHIACTIC CENTER, IN CLARION, PENNSYLVANIA, AF-
TER HAVING SUFFERED A **TRAUMATIC BRAIN INJURY** AT THE VISIONQUEST
JUVINILE PACEMENT FACILITY.
2.      PRIOR TO BEING TAKEN TO THE CLARION HOSPITAL, THE PLIAN-
TIFF, ACCORDING TO STAFF, HAD BEGAN SHOWING SIGNS OF ABNORMAL BE-
HAVIOR OVER A PERIOD OF INNUMERABLE DAYS WHICH INCLUDED NOT ΞAT-
ING, DRINKING, SLEEPING, SPEAKING, OR FUNCTIONING PROPERLY.
3.      THE RESPONSE OF THE STAFF, OR COUNSELOR, WAS TO TELEPHONE
THE FATHER OF THE PLAINTIFF ON OR ABOUT MARCH 5,2005, AFTER WHICH
TIME THE PALINTIFF WAS TRANSPORTED TO THE CLARION PSYCHIACTRIC
CENTER..NOTING THAT THE PLAINTIFF WAS UNABLE TO VERBALLY COMMUNI-
CATE WITH HIS FATHER, MR. REGINALD CARTER.
3.      THE PLAINTIFF FOUND OUT LATER THAT HIS FATHER DEMANDED
TAHT VISIONQUEST REMOVE PLAINTIFF FROM THIER FACILITY AT ONCE AT
THAT HE, THE FATHER WAS HEADED TO THE PHILADELPHIA OFFICE IN THE
JUVINILE COURT BUILDING TO DEMAND ACTION.
4. **PLAINTIFF HAKIM BOND'S BIRTHDATE IS SEPTEMBER 14,1988, WHICH
BRINGS HIM WITHIN THE STATUTE OF LIMITATIONS FOR THE REFILING OF
THIS CIVIL ACTION ACCORDING TO A WESREN PENNSYLVANIA FEDERAL COUR
COURT JUDGE, THE HONORABLE MR. MCGLAUGHLIN.**
5.      DURING A CONFERENCE ONCE BETWEEN THE PLAINTIFF, HIS COUN-
SELOR, AND FATHER; THE FATHER INFORMED PLAINTIFF THAT IF HE
SHOULD DO HIS BEST IN THE PROGRAM AND THAT IF HE , PLAINTIFF,
HAD ANY COMPLAINTS AGAINST ANYONE, INCLUDING STAFF, THAT HE HAD
THE CONSTITUTIONAL RIGHT TO FILE A COMPLAINT, TO WHICH THE FOR-
EIGN BORN COUNSELOR COUNTERED,"THE ONLY RIGHT HE HAS IS TO DO
WHAT I TELL HIM TO DO". PLAINTIFF'S COUNSELOR WENT ON TO SAY
THAT IN HIS COUNTRY THERE WERE NO SUCH RIGHTS..TO WHICH PLAINTIFF
DAD INFORMED HIM THAT HE WAS NOT IN HIS COUNTRY AND THAT WE, A-
MERICANS, ENJOYED SUCH RITHGS.
5.      VISIONQUEST IS A NATIONAL CORPORATE JUVILE DELINQUENT FACI-
LITY WHO UTILIZES EXTREME BOOT CAMP MEASURES, AND WHO IMPOSES
INDIAN CULTURE AND PRACTICES ON YOUTH, MANY OF WHICH HAVE HAD
DIFFICULT TIME COMPREHENDING THIER OWN CULTURE, WHO UPON ENTRY IN
TO THE FRANKLIN FACILITY ENCOUNTER MILITARISTIC, AND CULTURAL
SHOCK.
6.      THE FATHER OF PLAINTIFF DID GET TO THE PHILADELPHIA VISION-
QUEST OFFICE AT THE JUVINUILE COURT AT 1801 VINE STREET, WHERE
HE SPOKE WITH SEVERAL STAFF MEMBERS WHO THEN TELEPHONED THE RURAL
WESTERN PENNSYLVANIA FACILTY, WHO INFORMED THE COURTHOUSE OFFICE
THAT THE PLAINTIFF HAD BEEN TRANSPORTED TO THE CLARION PSYCHIAC-
TRIC CENTER, IN CLARION PENNSYLVANIA, ALSO IN WESTERN PENNSYLVA-
NIA.
7.      ON SUNDAY, MARCH 21,2005, PLAINTIFFS FATHER ARRIVED AT THE
CLARION PSYCHIACTRIC CENTER, WHERE ACCORDING TO HIM, HE FOUND
HIS **FIFTEEN YEAR OLD, DISHEVELED, DIRTY, SMELLY, RAGED APPEARING,
WALKING BAREFOOTED ON A COLD FLOOR, AND IN A STATE OF CATATONIA.**
8.      THE FATHER WAS INFORMED THAT THE PLAINTIFF WAS NOT EATING,
DRINKING, OR COMMUNICATING, WHICH WAS OBVIOUS TO A SHOCKED FATHER
AS HE WOULD LATER CONFIDE HIS STATE OF MIND TO HIS SON, OR PLAIN-
TIFF AT A LATER DATE UPON SEEING HIS SON IN SUCH TRAUMATIC CONDI_
TION.

8.    THE PRESIDING DOCTOR AT THE CLARION PSYCHIACTRIC CENTER
ADMINISTERED DRUGS INTO THE PLAINTIFF WITHOUT PARENTAL CONSENT,
OR COURT ORDER IN VIOLATION OF MENTAL HEALH RIGHTS.
9. A. THE DRUGS ADMINISTERED, WELBUTRIN, AND ZYPREXA, HAVE BEEN
FOUND TO BE HIGHLY ADDICTIVE, TOXIC, AND LINKED TO SUICIDE AS
A SIDE AFFECT AND WERE CAUSE FOR CIVIL LEGAL ACTION WHEREIN THE
PHARMACUETICAL COMPANIE(S) SETTLED OUT OF COURT..THE DRUGS HAD
ALSO BEEN LINKED TO DIABETES AND ORGAN FAILURE.
10.    PLAINTIFF HAKIM BOND, WAS DISCHARGED IN A NEGLECTFUL WAY
FROM THE CLARION PSYCHIACTRIC CENTER, TO THE YOUTH STUDY CENTER
IN PHILADELPHIA WHERE HE ARRIVED IN A STATE OF CATATONIC SHOCK IN
ABOUT EARLY APRIL, WHICH WILL BE INDICATED DURING THE DISCOVERY
PROCESS.
11.A. WHILE IN BOOT CAMP, AND INDER UNBEARABLE PRESSURE, THE
PLAINTIFF SIMPLY EXPLODED AND WAS RESTRAINED BY STAFF..PLAIN-
TIFF BOND, THEN REFFERED TO AS TROOPER BOND, WAS UNDER EXTREME
MENTAL AND EMOTIONAL PRESSURES.
12.    IN BOOT CAMP, PALINTIFF WAS NOT ALLOWED TO TAKE PART IN
CONGREGATIONAL PRAYERS DURING THE MONTH OG RAMADA, OR THE FAST-
ING MONTH AND WAS TOLD THAT TO ALLOW SUCH WOULD GIVE THE APPEAR-
ANCE OF HAVING FORMED A SEPARATE GROUP *FOR MUSLIM YOUTH*
13.    PLAINTIFFS DAD COMPLAINED TO THE PLACING JUDGE, THE HONOR-
ABLE LORI DUMAS THAT THE VISIONQUEST STAFF WAS REQUESTING MONEY,
OR DONATIONS ON A PREPAID, BY THE VISIONQUEST CORPRATION, OF
FAMILY MEMEBERS WHO LOADED ONTO BUSES IN PHILADELPHIA..WHICH GOT
BACK TO THE STAFF,, THE JUDGE HAVING REVEALED WHO MADE THE COM-
PLAIN..THEREBY CAUSING A DEGREE OF HOSTILITY AGAINST THE DAD...
IN ADDITION, ON ANOTHER OCCASSION, THE THE DAD HAD A DISAGREEMENT
WITH MR. MCGLAUGHLIN OF THE PHILADELPHIA OFFICE WHO LATER, WITH
OUT TELLING THE DAD, THAT HIS VISITS WERE CURTAILED..IN ADDITION,
ANOTHER INDIVIDUAL FROM THE PHILADELPHIA OFFICE INFORMED THE SON
THAT HIS FATHER SHOULD NOT COMPLAIN TO THE JUDGE AGAIN OR THERE
WOULD BE NEGATIVE CONSEQUENCES..WITH A THREAT TO PLACE THE PLAIN-
TIFF IN A HARD CORE STATE FACILITY. THIS WAS A DIRECT THREAT TO A
FIFTEEN YEAR OLD WHO HAD NEVER BEFORE BEEN LOCKED AWAY OR AWAY
FROM HOME FOR ANY LONG OERIOD OF TIME..AND WHO HAD BEEN REMOVED
FORM A STATE FACILITY BECAUSE THE JUDGE AGREED WITH THE FATHER
THAT FOR THE PLAINTIFFS FIRST PLACEMENT THAT THE STAE FACILITY
WAS INAPPROPRIATE.
14.    AT ONE TIME A YOUTH INFORMED THE PLAINTIFF OF CONFIDENTIAL
INFORMATION IN HIS FILE, INDICATING A LACK OF SECURITY AND A VIO-
LATION OF PRIVACY LAWS.
15.    PLAINTIFF BOND ARRIVED AT THE YOUTH STUDY CENTER IN A STATE
OF FULL DECOMPENSATION, *AND* IMMEDIATELY PALCED UNDER THE CARE OF
DR. PETER MEYER, OF THE CHILDRENS HOSPITAL OF PHILADELPHIA, AND
A TREAMENT TEAM.
16.    THE YOUTH STUDY CENTER IS A YOUTH PRISON DETENTION CENTER
OWNED BY PHILADELPHIA, AND OPERATED UNDER IT'S DEPARTMENT OF
HUMAN SERVICES.
17.    THOUGH COMPLETELY CAPABLE AND EMPOWERED, DR. PETER MEYER
DECIDE NOT TO HAVE PALINTIFF BOND REMOVED FROM THE PRISON, AND
TAKEN TO AN OUTSIDE HOSPITAL FACILITY FOR TREATMENT.

( )

18.   IN CLEAR VIEW OF DR. PETER MEYER, THE TREATMENT TEAM, AND ADMINISTRATOR CHERYL RANSOM GARNER, AND INNUMERABLE MEDI-CAL STAFF AND OTHER PERSONNEL, PLAINTIFF BOND WOULD, OVER A THREE MONTH PERIOD, ENDURE SEVERAL TORTUROUS STATES OF DECOMPENSARION TO INCLUDE BOUTS OF SHEER TERROR, OR FEAR, AND WAS UNABLE TO EAT, SLEEP, WASH, COMMUNICATE, OR OTHERWISE TAKE CARE OR HIMSELF AND WOULD BE VISITED BY HIS PARENTS ALMOST DAILY IN THAT STATE OF EXISTENCE..DURING THIS ENTIRE PERIOD, THE PLAINTIFF WAS NOT EVEN ADMITTED TO THE INFIRMARY AREA OF THE PRISON.

19.   DURING LONG PERIODS OF CATATONIA, PALINTIFF BOND WAS MEDI-CATED THOUGH NOT BEING NOURISHED.

20.   AFTER TELEPHONING AND SPEAKING WITH A DR. AT THE YOUTH STUDY CENTER, PLAINTIFF WAS TAKEN OUT TO THE CHILDRNES HOSPITAL IN A STATE OF CATATONIA, AND OBVIOUS MENTAL DETERIORATION, AT WHICH TIME THE FATHER SPOKE WITH THE ATTENDING PHYSICIAN AND REQUESTED THAT HE HAVE PALINTIFF HOSPITALIZED...THE DR. TOLD THE DAD THAT THE SON DID EAT AND TAHT HE WOULD DO NOTHING IN TERMS OF MENTAL HEALTH. THE ATTENDING DR. WAS OF MIDDLE EASTERN DESCENT. NOTE: THE FATHER OF THE PLAINTIFF CALLED ON BEHALF OF THE SON AND SPOKE WITH A DR...ALSO, ONE OR TWO STAFF MEMEBERS, NOT MEDICA PERSONNELL, SPOKE UP FOR THE PLAINTIFF. STILL, HE WAS RETUNED TO THE DUNGEON TO ENDURE **CRUEL AND UNUSUAL PUNISHMENT.**

21.   IN MID JUNE 2004, THE PLAITIFF WAS SENT TO THE LAUREL RIDGE TREATMENT CENTER, FROM THE YOUTH STUDY CENTER WHERE HE ARRIVED IN A STATE OF CATATONIA.

22.   **BY** KEEPING THE PLAINTIFF AT THE YOUTH STUDY CENTER, DR. PETER MEYER OF THE CHILDRENS HOSPITAL OF PHILADELPHIA, AND THE TREATMENT TEAM, AND ADMINISTRATORS AND OTHER THERAPIST UNDR THE DEPARTMENT OF HUMAN SERVICES OF PHILADELPHIA, AND OTHER PRVATELY OWNED CORPORATIONS WERE ABLE TO **PROFIT ON A DAILY BASIS** WHILE IM-BEDDING PLAINTIFF BOND WITH TERROR AND MENTAL INSTABILITY WHICH COULD HAVE A LIFETIME OF DETRIMENTAL AFFECTS, OUTSIDE OF HAVING BEEN INFORMED BY MEDICAL PROFESSIONALS THAT THE VARIOUS DIANOSIS CONSTITUTED A LIFETIME CHALLENGE.

23.   STAFF MEMBERS AT VISIONQUEST HAD DIANOSED THE PLAINTIFF WITH DEPRESSION PRIOR TO TELEPHONING HIS DAD AND EVENTUALLY, OR AT THE DAD'S INSISTENCE, TAKEN PLAINTIFF TO THE HOSPITAL.

24.   PLAINTIFF, WHILE AT CLARION, WAS DIANOSED WITH CATATONIA, AND DEPRESSION.

24.   THE VISIONQUEST ENVIRONMENT WAS AGGRESSIVE AND UNRULY WITH FIGHTS ALL OF THE TIME, AND MASS ESCAPES.

25.   BEING SEVEN OR EIGHT HOURS AWAY FROM HOME AND CUT OFF FROM HIS FATHER AND MOTHER, IN AN UNSAFE MILITARISTIC, AND HOSTILE EN-VIRONMENT IN RURAL PENNSYLVANIA, AND UNDER THREAT OF PENALTY FROM VISIONQUEST PERSONNEL TRAUMATIZED PLAINTIFF WHO ATTEMPTED TO ADAPT AS HE WAS A MONTH OR SO FROM BEING DISCHARGED TO GO HOME FROM VISIONQUEST, ALL PROVED TO BE UNBEARABLE AND BROKE THE PALIN TIFF DOWN.

26.   PLAINTIFF HAD NOT BEFORE HIS COLLAPSE AT VISIONQUEST EN--DURED ANY CATASTROPHIC MENTAL ILLNESS, OR BRAIN INJURY.

27.   VISIONQUEST FAILED TO RROVIDE A SAFE ENVIRONMENT FOR THE FIFTEEN YEAR OLD PLAINTIFF, AND THEN FURTHER NEGLECTED HIM AFTER THEY BROKE HIM DOWN.

28.   ATER A DISAGREEMENT BETWEEN THE FATHER OF THE PALINTIFF
WITH DR. SINGAL OF THE FAIRMOUNT BEHAVIORAL FACILITY, WHERE THE
PARENTS OF THE PLAINTIFF PLACED HIM, WITH THE MOTHERS PRIVATE
INSURANCE, SABRINA BAKKSTONE, AND AMANDA LATSHAW DECIDED TO CON-
TACT A PROBATION OFFICER, AND A DHS WORKER AND SEEK THIER ASSIST
ANCE IN CALLING FOR AN EARLY COURT DATE AS PLAINTIFF WAS ON
PROBATION AT THE TIME. THE DHS WORKER, MRS. EVENLYN PARKER RE-
FUSED TO GO ALONG WITH THE ACTION. IN FACT, AMANDA LATSHAW, WAS
INSTRUMENTAL IN HAVING PLAINTIFFS CASE TRANSFERED TO THE HEAD
JUDGE IN THE JUVINILE SYSTEM WHO WAS KNOWN TO BE HARSH, AND THUS
FEAR(ED BY MANY.
29.   ON THE DAY THAT THE PLAINTIFF WAS TO ENTER INTO THE COURT-
ROOM OF JUDGE DOUGHERTY, HE DECONPENSATED DIRECTLY OUTSIDE OF THE
COURT AND       AND COULD NOT RESPOND ONCE INSIDE THE COURTROOM
DUE TO CATTONIC SHOCK WHICH OCCURED IN FRONT OF MANY PEOPLE.
30.   PRIOR TO THIER ACTIONS, NEITHER AMANDA LATSHAW, OR SABRINA
BACKSTONE ATTEMPTED TO CONTACT THE PLAINTIFF OR HIS PARENTS TO
ADVISE THEM OF HER ACTIONS THUSLY BLATANTLY DENYING PATIENTS
RIGHTS AND DUE PROCESS OF LAW AND EQUAL PROTECTION RIGHTS, NOT
TO MENTION BASIC HUMAN CONSIDDRATION.
31.   THE ACTIONS OF SABRINA BACKSTONE AND AMANDA LATSHAW RESULTE(D)
IN THE IMMEDIATE PLACEMENT OF THE PLAINTIFF IN THE YOUTH STUDY
CENTER PRISON, WHERE HE HAD TO BE TAKEN TO AND HOSPITALIZED IN
THE HORSHAM CLINIC, WHICH IS BELIEVED TO HAVE BEEN ACHIEVED, IN
PART, BECAUSE DR. PETER MEYER AND THE CHILDRENS HOSPITAL OF PHILA
DELPHIA NO LONGER HAD THE MENTAL HEALTH PROVISION CONTACT.
32.   IN ADDITION, THE ACTIONS OF THE COMMUNITY BEAVIORAL HEALTH
EMPLOYEES LEAD TO FURTHER HOSPITALIZATIONS AND PLACEMENTS, TO IN-
CLUDE IMPRISONMENT AT A JUVINILE STATE FACILITY WHEREIN THE
PLIANTIFF ENDURED GREAT DIFFICULTY, AND SEPARATION FROM HOME IN
UTAH.
33.   THE INITIAL MENTAL AND EMOTIONAL COLLAPSE LED THE PLAINTIFF
TO BE PLACED IN A FACILITY IN TEXAS, THE LAUREL RIDGE TREAMENT
CENTER..AS WELL AS THE HORSHAM CLINIC IN PHILADELPHIA, THE FRIEND
HOSPITAL, AND MORE HARMFUL MEDICATIONS AND MISTREATMENT AND NEG=
GLECT.
34.   THE PLAINTIFF WAS PLACED WITH THE WORDSWORTH INSTITUTION, A
AND BENCHMARK IN WOODSCROSS UTAH, AS A RESULT OF COMMUNITY BEHA-
VORAL HEALTH..AND THE CRESSON JUVINILE STATE FACILITY.
35.   DR. THMAS, 
    OF THE HORSHAM CLINIC..DR. THOMAS ALSO PERFORMED EVALUATIONS
FOR MENTAL HEALTH FOR THE JUVINILE COURT, DESINATED PLAINTIFF BON
BOND CONDUCT DISORDER DELINQUENT, WITHOUT EITHER HIS PARENTS, OR
HIS KNOWLEDGE WHICH LED, OR PERMITTED A PREJUDICIAL PLACEMENT AT
THE BENCHMARK FACILITY IN UTAH.
35.   THE PLAINTIFF WAS HARRASSES AND PROVOKED AND FAILED MISERAB
BLY AND ESCAPED THE NEGLECT AT WORDSWORTH.

( 4 )

36.   HAVING BEEN PROFILED, UNKNOWINGLY, AS CONDUCT DISORDER
DELINQUENT..IN CONTRAST TO HAVING SUFFERED ACUTE CATATONIA, DE-
PRESSION, PARANOID SCHIZOPHRENIA, AND BI POLAR..THE TREATMENT
TEAM AT BENCHMARK **NEVER** SPECIFICALLY TREATED PLAINTIFF FOR HIS
UNDERLYING MENTAL ILLNESS. IN ADDITION, THEY HAD NO TRAINING IN
CULTURAL SPECIFICATION WHICH ENABLED THEM TO UNDERSTAND
AFRICAN AMERICAN YOUTH FROM PHILADELPHIA.
37.   BENCHMARK, IN WOODSCROSS, UTAH, PRACTICED RACISM AND EVEN
HAD A PREDOMINANTLY, OR ALL WHITE UNIT AT ONE TIME.
38.   UPON LEARNING THAT PLAINTIFF WAS PARTY TO THE FIRST EN-
DEAVOR FOR THIS CIVIL ACTION, MY DR. ABRUPTLY, REMOVED ME , PLAIN
TIFF FROM MEDICATION, AFTER HAVING IGNORED MY FATHERS CONCERNS
FOR MONTHS, WHICH PRECIPITATED A CRASH WHICH LED TO AGGRESSIVE
BEHAVIOR, AND INSTABILITY...AFTER SUCH AN EPISODE, THE DR.
PLACED ME BACK ON THE DRUG, ME REFERRING TO PLAINTIFF.
39.   THOUGH THE TREATMENT TEAM NEVER RECOGNIZED AND OR TREATED
PALINTIFF FOR HIS UNDERLYING MENTAL ILLNESS, THEY WERE SURE TO
MISTREAT AND RESTRICT HIS RIGHTS AND PRIVILEDGES WHICH RESULTED
IN PHYSICAL PROVOCATION, A BROKEN HAND, ILLEGAL INTERROGATION BY
SUPERVISOR DAVE GUYMAN LCSW, AN ARREST, AND A NEGATIVE TRANSFER
OUT OF THE           FACILITY WHEREUPON BENCHMARK TOOK ABSOLUTE
LY NO RESPOSIBILITY FOR THE GROSS FAILURE OF THE PLAINTIFF..
PLAINTIFF WAS ARRESTED IN UTAH, NO CHARGES WERE FILED, HE WAS
TAKEN TO A HOSPITAL WHERE THE ATTENDING PHYSICIAN DID NOT REPAIR
HIS BROKEN HAND..NEITHER DID BENCHMARK TAKE HIM TO ANOTHER HOS-
PITAL FOR TREATMENT...THE STAFF AT BENCHMARK WAS RACIALLY PREJU-
DICED TOWARD THE PLAINTIFF.
40.   PLAINTIFF BOND WAS ADMITTED TO BENCHMARK ON JUNE 7,2006, AN
AND DISCHARGED ON MARCH 2,2007.


41.   PLAINTIFF BOND, MANAGED TO DO PRETTY GOOD IN SOME OF THE
PLACEMENTS AND HOSPITALS, INCLUDING THE LAUREL RIDGE TREATMENT
CENTER IN TEXAS..IN THIER DISCHARGE SUMMARY, AND IN ORDER TO SUP
PORT THIER PREJUDICIAL AND HEAVILY CONVOLUTED CLAIMS, BENCHMARK
STATES IN THIER DISCHARGE SUMMARY THAT THE PLAINTIFFF FAILED BE-
VCAUSE HIS FATHER MINIMIZES HIS NEDED FOR TREATMENT, WHICH IS A
TOTAL LIE..THEY MENTION LAUREL RIDGE AS A PLACE OF FAILURE.......
AND THEY NEVER TAKE ANY RESPOSIBILITY.
42.  NOWHERE IN THE BENCHMARK SUMMARY, DOES IT MENTION THAT PLAIN
TIFF BOND WAS BEING TREATED FOR MENTAL ILLNESS...THIS NOTION IS A
PRIMARILY RACIST BASED FARCE TO CRIMNALIZE, DISENCHANT, AND DESTR
STROY AFRICAN AMERICAN YOUTH..SUMMARY IS ATTACHED HERETO...AS WEL
WELL AS A LETTER FROM LAUREL RIDGE PRAISING THE PLAINTIFF..AND
THERE IS A NEWSPAPER ARTICLE FROM NEW JERSEY TELLING HOW THIER DR
DOCTORS MUST LEARN RACIAL SENSITIVITY TO CUT DOWN ON PREJUDICE...
AND A NATIONAL ORGANIZARTION WHICH SPEAKS TO PREJUDICE IN MENTAL
HEALTH TREATMENT AGAINST AFRICAM AMERICANS.
43  DR. THOMAS OF FAMILY COURT, 1801 VINE STREET, EVALUATED THE
PLAINTIFF AND CLASSIFIED HIM AS CONDUCT DISORDER DELINQUENT WITHO
OUT INFORMING EITHER HIM OR HIS PARENTS OF THE RAMIFICATIONS OF
THE SAME, SUBJECTING HIM TO BEING PLACED AND BEING ABUSED AND
FAILING AT BENCHMARK BEHAVIORAL HEALTH SYSTEMS.

THE ACTIONS OF THE DEFNDANTS HAVE CAUSED IRREPARABLE DAMAGE
TO THE PLAINTIFF AND PUT HIM IN A SITUATION WHERE HE WILL NEED A
LIFETIME OF CARE WHICH COULD, AND MOST PROBABLY WILL INCLUDE VA-
RIOUS MEDICATIONS FROM TIME TO TIME. IT HAS BEEN REPORTED THAT TH
THE LIVES OF MOST MENTAL HEALTH PATIENTS ARE SEVERLY MARGINALIZED
AND SHORTENED. TIL TODAY, PLAINTIFF SUFFERES BOUTS OF DECOMPESA-
AND A FEAR BASED ON THE KNOWLEDGE THAT HE CAN BE BOTH NEGLECTED
AND MISTREATED IN THE FIELD OF MENTAL HEALTH. VISIONQUEST AND DR.
PETER MEYER OF CHILDRENS HOSPITAL,THE YOUTH STUDY CENTER AND RELA
TED DEFENDANTS, AND COMMUNITY BEHAVIORAL HEALTH AND BENCHMARK ALL
ACTED EITHER IN COLLUSION, OR SEPARATELY TO DENY MEDICAL RIGHTS
AND PERSONAL DECISION MAKING, AND CONSTITUTIONAL RIGHT TO THE
PLAINTIFF WITHIN THE BOUNARIES OF THE JUVINILE JUSTICE SYSTEM
WHICH CONSTITUTED CRUEL AND UNUSUAL PUNISHMENT, PARTICULARLY AT
VISIONQUEST, THE YOUTH STUDY CENTER UNDER DR. PETER MEYER AND THE
CHILDRENS HOSPITAL OF PHILADELPHIA..  BOTH DEFENDANTS AMANDA LAT-
SHAW AND SABRINA BACKSTONE, IN PARTICULAR, MISUSED THIER POSI-
TIONS AS EMPLOYESS OF A MENTAL HEALTH PROVIDER , COMMUNITY BEHA-
VIORAL HEALTH, TO HAVE THE PLAINTIFF UNJUSTLY, AND WITHOUT EVER
COMMUNICATING WITH HIM, AND PREVENTING HIM FROM USING HIS PRIVATE
INSURER, MAGELLAN, TO RECIEVE MEDICAL CARE AS SOUGHT AFTER BY HIS
PARENTS...IN ALL INSTANCES, RACIAL PROFILING CAME INTO PLAY.

    INSTITUTIONS THAT OUR COMMUNITY DEPENDS ON TO TREAT THE DIS-
ADVANTAGED ARE DISSERVED WHEN AN INDIVIDUAL SUCH AS THE PLAITIFF
IS CAUSED TO ENDURE GROSS MISTREATMENT..THIS CANNOT BE ALLOWED TO
HAPPEN AS INDIVIDUALS, CORPORATIONS, AND THE MINICIPALITIES AND
STATES MUST BE HELD TO A HIGH DEGREE OF ACCOUNTABILTY, AND MUST
DEMAND OF THEMSELVES A CONTINUAL OVERSIGHT TO MAKE SURE THAT THOS
THOSE UNDER THIER SOVERIGN UPHOLD THE RIGHTS OF ALL INDIVIDUALS
WHETHER UNDER THE AUSPICES OF COURT ORDER, OR ANYTHING ELSE.

    THEY HAVE LIBELED, SLANDERED, AND DEFAMED THE CHARACTER OF
THE FATHER OF THE PLAINTIFF WHO AT ALL TIMES HAS ENDEAVORED TO
BE HELPFUL, AND WHO, AS A DYNAMIC AND OUTSPOKEN MAN HAS BEEN
SHUNED, AND WORSE STILL, SEVERAL OF THE DEFENDANTS, ESPECIALLY
SABRINA BACKSTONE, AND AMANDA LARSHAW OF COMMUNITY BEHAVIORAL
HEALTH, HAVE MISTREATED THIS PLAINTIFF BECAUSE HIS FATHER HAS
BEEN DILIGENT IN FIGHTING FOR HIM-ALL OF HIS LIFE, NOT JUST
WITHIN THE JUVINILE SYSTEM..BUT EVEN IN HIS SCHOOL AS THE HOME AN
AND SCHOOL ASSOCIATION PRESIDENT.
    AT ALL TIMES, THE DEFENDANT(S) ACTED UNDER COLOR OF THIER
RESPECTIVE STATE LAWS.

WHEREFORE, THE PLAITIFF DEMANDS JUDGEMENT AGAINST THE DEFENDANTS FOR DAMAGES AS FOLLOWS: DEFENDANTS-VISIONQUEST SHALL PAY BOTH COMPENSATORY, AND PUNITIVE DAMAGES RESPECTIVELY IN THE AMOUNTS OF: **ONE MILLION**, AND **TEN MILLION,** DOLLARS.

DEFENDANT CLARION HOSPITAL SHALL PAY BOTH COMPENSATORY, AND PUNI-TIVE DAMAGES IN THE AMOUNTS OF **FIVE HUNDRED THOUSAND**, AND **ONE MILLION DOLLARS.**

THE ATTENDING MEDICAL DR. OF CLARION, SHALL PAY BOTH COMPENSATORY AND PUNITIVE DAMAGES AS FOLLOWS, IN THE AMOUNTS OF: **ONE HUNDRED THOUSAND**, AND **ONE MILLION DOLLARS.**

DEFENDANTS DR. PETER MEYER, AND THE CHILDRENS HOSPITAL OF PHILADEL PHIA SHALL PAY BOTH COMPENSATORY, AND PUITIVE DAMAGES, RESPECTIVE LY IN THE AMOUNTS OF: **ONE HUNDRED THOUSAND, AND ONE MILLION DOL-LARS**, AND **TEN MILLION DOLLARS,** THE TEN MILLION BEING DESINATED FOR THE CHILDRENS HOSPITAL.

DFENDANT(S), THERPIST, OR TREATMENT TEAM AND THIER PARENT CORPORA TION..SHALL COMBINE COMPENSATORY AND PUNITIVE DAMAGES IN THE A-- MOUNT OF: **FIVE HUNDREE THOUSAND DOLLARS.**

DEFENDANT THE DEPARTMENT OF HUMAN SERVICES OF PHILADELPHIA, AS **THE YOUTH STUDY CENTER UNDER THE AUSPICES OF** PHILADELPHIA COUNTY, SHALL COMBINE PUNITIVE AND COMPENSATIORY JUDGEMENTS AS FOLLOWS: **ONE** HUNDRED THOUSAND **AND ONE MILLION DOLLARS** RESPECTIVELY.

DEFEDNAT PHILADELPHIA, AS SOVERIGH OF THE DEPARTMENT OF HUMAN SER VICES  SHALL COMBINE COMPENSATORY, AND PUNITIVE DAMAGES IN THE RESPECTIVE AMOUNTS OF: **ONE HUNDRED THOUSAND AND ONE MILLION DOL LARS**, RESPECTIVELY.

DFENDANT(S) DOCTOR(S), MEDICAL STAFF AT THE YOUTH STUDY CENTER OU OUTSIDE OF THE MENTAL HEALTH DEPARTMENT, TO PAY AS A PRIVATE PRAC TICING DOCTOR IN THE AMOUNT OF: **ONE HUNDRED THOUSAND DOLLARS** IN BOTH PUNITIVE, AND COMPENSATORY DAMAGES... OTHERS SHALL HAVE THIER PAYOUTS INCLUDED IN THE GENERAN PAYOUT UNDER THE DEPARTMENT OF HUMAN SERVICES-THE CITY OF PHILADELPHIA.

DEFENDANT **BENCHMARK BEHAVIORAL HEALTH SYSTEM** SHALL PAY OUT THE AMOUNT OF: **ONE MILLON DOLARS, AND TEN MILLION DOLLARS** RESPECTIVE LY FOR BOTH COMPENSATORY AND PUNITIVE DAMAGES. DR. JEROME VANCE SHALL PAYOUT **ONE MILLION DOLLARS.**

THE RESPECTIVE STATES OF BOTH UTAH, AND PENNSYLVANIA SHALL PAYOUT FOR THIER DEPARTMEMTS OF PUBLIC WELFARE, AND OR THEMSELVES, THE AMOUNTS OF: **TEN MILLION DOLLARS EACH..**  FOR PAIN AND SUFFERING AND A LIFETIME BRAIN INJURY AS THE OVERSEERS OF THOSE UNDER THIER SOVERIGN DOMAIN...AND FOR SUCH OTHER RELIEF THIS COURT DEEMS JUST
NOTE: DR. THOMAS IS SUED FOR A TOTAL AMOUNT OF **ONE HUNDRED THOU-SAND DOLLARS FOR BOTH PUNITIVE AND COMPENSATORY DAMAGES,** AS A DEFENDANT.

A JURY TRIAL IS REQUESTED BY THE PLAINTIFF

DATE: SEPTEMBER  12,2008


RESPECTFULLY SUBMITTED

HAKIM BOND


HAKIM BONDC/O REGINALD CARTER
1937 W. ROWAN STREET
PHILADELPHIA, PA. 19140
PHONE: 215 239 8180

( 8 )

# CONTACT INFORMATION SHEET

**Civil Action No.:** _____

**Name:**       HAKIM BOND
_____

              (Please print)

**Address:**    1937 W. ROWAN STREET                    3
_____

              PHILADELPHIA, PA. 19140
_____

**Phone #:**    215 239 8180
_____

              (Include area code)

**E-mail address:**    _____

# UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|   |   |   |
|---|---|---|
|   | : | CIVIL ACTION |
| v. | : |   |
|   | : |   |
|   | : |   |
|   | : | NO. |

## MOTION TO PROCEED IN FORMA PAUPERIS

_____
Signature

1937 W. ROWAN STREET
_____
Address
PHILA., PA. 19140
HAKIM BOND
_____
Print your name

## STATEMENT IN SUPPORT OF REQUEST TO PROCEED IN FORMA PAUPERIS

HAKIM BOND
_____
Full name of Plaintiff

v.

NATIONAL DIRECTOR, ET AL                    Civil Action No._____
_____
Defendant(s)

I, HAKIM BOND
the above-entitled case; that in support of my motion to proceed without being required to prepay fees, costs, or give
_____, declare under the penalty of perjury, that I am the plaintiff in
security therefor, I declare that because of my poverty I am unable to pay the costs of said proceeding or to give security
therefor and that I believe I am entitled to relief.

1.) Are you presently employed?              Yes ☐      No ☑
     a.) If the answer is "yes", state the amount of your salary or wages per month, and give the name and address
       of your employer.

_____
_____

     b.) If the answer is "no", state the date of last employment and the amount of the salary and wages per month
       which you received.

_Not available - will produce late_
_last employment October 2007_

2.) Have you received within the past twelve months any money from any of the following sources?
     a.) Business, profession, or form of self-employment?              Yes ☐          No ☑
     b.) Rent payments, interest, or dividends?                         Yes ☐          No ☑
     c.) Pensions, annuities, or life insurance payments?              Yes ☐          No ☑
     d.) Gifts or inheritances?                                        Yes ☐          No ☑
     e.) Any other sources?                                            Yes ☐          No ☑
     If the answer to any of the above is "yes", describe each source of money and state the amount received from
     each during the past twelve months.              Yes ☐          No ☑

3.) Do you own cash, or do you have money in a checking or savings account?   Yes ☐      No ☑
If the answer is "yes", state the total value of the items owned. _____

4.) Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property (excluding
ordinary household furnishings and clothing)?                         Yes ☐   No ☑
If the answer is "yes", describe the property and state its approximate value. _____

5.) List the persons who are dependent upon you for support, state your relationship to those persons, and
indicate how much you contribute toward their support. _NONE_

I declare under the penalty of perjury that the foregoing is true and correct.

EXECUTED ON   SEPT., 12, 2008
                     (Date)                    (Plaintiff's Signature)



08cv4527

# N.J. doctors to accrue culture

## New legislation requires M.D.s to complete cultural sensitivity class

### By Angela Delli Santi

TRENTON, N.J. – Barbara Eckstein does not want to be the kind of doctor who treats some patients better than others.

The 30-year-old medical student believes a new law requiring doctors to complete cultural sensitivity training before practicing medicine in New Jersey will help teach physicians to care for all their patients equally well.

"There's a core group of believers now who understand how important this is," said Eckstein, a Nutley resident and senior at New Jersey Medical School in Newark. "The key is to get the rest of the medical community to recognize it and to not feel threatened by it."

The state Legislature wrote a new prescription for the state's physicians by approving a measure requiring M.D.s to be culturally competent as a condition of getting – or keeping – their medical licenses.

When acting Gov. Richard J. Codey signed the bill into law late last month, he noted the importance of having doctors that recognize the prevalence of high blood pressure, asthma, AIDS and other diseases among some minority communities.

"This new law will help provide equality in medical care by requiring that New Jersey physicians take special training to diagnose and treat conditions that are prevalent among minorities," Codey said.

curriculum in the state's medical colleges will have to include instruction in cultural competency designed to address race- and gender-based disparities in medical treatment.

It hasn't been decided how the training will be implemented – it could be a required lecture, online course or something else – but all doctors in the state will have to complete the requirement before they are licensed or relicensed. New Jersey doctors renew their medical licenses every two years.

Officials with the Board of Medical Examiners, which sets standards for medical licenses in New Jersey, would not comment before meeting later this month to discuss how the law will be implemented, said board spokesman Jeff Lamm.

The Federation of State Medical Boards, a national medical regulatory authority, said New Jersey is believed to be the first state to require cultural competency as a condition for licensure.

California passed the Cultural and Linguistic Competency of Physicians Act of 2003, creating a voluntary program for physicians and surgeons to learn a foreign language and cultural beliefs that could impact patient health care. Lawmakers in Arizona, California and New York, meanwhile, have introduced legislation this year requiring cultural competency. A bill pending in Illinois would create a voluntary cultur-



## Message from Margaret Stout
## President NAMI Board of Directors

Recent research points to significant disparities in health care for African Americans in the United States. These studies conclude that mental health outcomes for this population are far bleaker than outcomes for Caucasians. According to researchers at Harvard University, in areas raging from diabetes to mental health, African Americans receive WORSE medical care than their white counterparts. That study, released March 13, 2002 in the Journal of the American Medical Association, concluded that the largest gaps in the delivery of quality care were found in the mental health arena.  According to the report, blacks released from inpatient mental health care received follow-up care 33 percent of the time, compared with 54 percent for whites. This data as well as data from the Surgeon General's 2001 Report, *Mental Health: Culture, Race and Ethnicity*, address one of the most unfortunate realities of our time: African Americans, and other communities of color in the United States, face significant barriers to quality mental health care.

One of the guiding principles driving the work of NAMI organizations at the national, state, and local levels is improving access to treatment for individuals and families affected by mental illness.  Therefore, it is only appropriate for NAMI to develop strategies that will address the many barriers faced by African Americans.

The purpose of this manual is to provide valuable information about the current mental health status of the African American community and resources for NAMI and other organizations who want to engage this community in a meaningful and culturally appropriate manner.
On behalf of the NAMI Board of Directors, I want to thank our African American NAMI leaders for all OF their work and dedication. Their commitment and hard work truly makes us the Nations Voice on Mental Illness.

Margaret Stout

President

NAMI National Board of Directors

Rcv 4527

1937 W. ROWAN STREET
PHILA., PA. 19140

THE DIRECTOR OF THE
DEFENDERS ASSOCIATION OF PHILADELPHIA
AND LUNA PATTELA , ASSISTANT
CHIEF MENTAL HEALTH UNIT
ASSISTANT DEFENDER
441 SANSOM STREET
PHILADELPHIA, PA. 1910

SEPTEMBER 16,2008

RE: HAKIM BOND #PP 948291

TO THE DIRECTOR AND
LUNA PATTEL:

AT THIS PARTICULAR TIME FURTHER INVOLVMENT WITH MY SON, HAKIM
BOND'S CASE WOULD CONSTITUTE A CONFLICT OF INTEREST IN THAT THIS
OFFICE COULD FACE A CIVIL SUIT REGARDING HIM.

ON JULY 22,2008, LUNA PATTEL DID INFORM THE FATHER, MYSELF, OF
HAKIM BOND THAT YOU AGREED WITH THE DOCTORS AT THE PHILADEL-
PHIA DETENTION CENTER THAT HAKIM WAS INCOMPETENT BECAUSE HE
WAS **UNCOOPERATIVE**-IN THAT HE WOULD NOT SIGN OFF ON PAPERS TO
HAVE HIS MENTAL HEALTH RECORDS RETIEVED. BEING UNCOOPERATIVE,
IN AND OF ITSELF DOES NOT CONSTITUTE **INCOMPETENCE.**

ON JULY 30,2008, LUNA PATTEL AUTHORED A LETTER TO HAKIM BOND
, WHERE IN THE LAST PARAGRAPH, SHE WRITES,"PLEAS CONTINUE WITH
YOUR TREATMENT AND, HOPEFULLY, AT THE NEXT LISTING YOUR CASE
WILL MOVE FORWARD.". BE ADVISED THAT HAKIM IS NOT ENGAGED IN,
NOR HAS HE EVER BEEN ENGAGED IN ANY SORT OF TREATMENT WITHIN
THE PHILADELPHIA PRISON SYSTEM..SO WHERE IS YOUR INFORMATION
COMING FROM, AND HOW COULD YOU ONCE AGAIN COME TO AN **ERRONEOUS**
CONCLUSION..IN THE SECOND OF TWO MAJOR ISSUES, THE FIRST BEING
A MATTER OF COMPETENCY?

IF THIS OFFICE GOES FORWARD AT THIS PARTICULAR TIME WITH IN-
VOLVEMENT WITH MY SON YOU WILL FACE A LAW SUIT.

YOU ARE REQUESTED THAT YOUR OFFICE WITHDRAWS FROM REPRESENTATION
RELATED TO THE COURT DATE OF SEPTEMBER 18,2008.

SINCERELY YOURS
*Reginald Carter*
REGINALD CARTER

*Hand delivered 9/17/08*

# DEFENDER ASSOCIATION
# OF PHILADELPHIA

1441 Sansom Street
Philadelphia, PA  19103
(215) 568-3190

ELLEN T. GREENLEE
DEFENDER

July 30, 2008

Mr. Hakim Bond PP #948291
P.I.C.C.
8301 State Road
Philadelphia, PA  19136

Dear Mr. Bond:

The Defender Association of Philadelphia represented you in the above-captioned matter on July 22, 2008 in Courtroom 504 at the Criminal Justice Center, 1301 Filbert Street, Philadelphia, PA.  Your case was continued until September 18, 2008 in Courtroom 504 at the Criminal Justice Center for status of mental health only.

As you were found incompetent to proceed with your case, your matter was continued.  Please continue with your treatment and, hopefully, at the next listing your case will move forward.

If you have any questions, please call me at 215-568-3190.

Sincerely,

Luna Pattela
Assistant Chief
Mental Health Unit
Assistant Defender

LP/mr